The order is Flint v. Dennison And whenever counsel are comfortably situated, you are free to begin. You may start whenever you're ready. Thank you, Your Honor. May it please the Court, my name is Jim Bopp. I represent Plaintiff Aaron Flint, below and before this Court. This case involves the application of the First Amendment to candidate expenditure limits in the university student body elections at the University of Montana. The bylaws of the University of Montana student government provides that any candidate for student senate is limited to three years on campus, most of whom are eligible to vote, which limits appearances, publishing, advertising, distributing literature. The University of Montana student government is established by the laws of Montana and exercises governmental power. They spend over approximately $500,000 in public funds, which are student fees, and they appoint members of university committees that govern the university. And, of course, the First Amendment has its most urgent application in campaigns for public office, and certainly the U.S. Supreme Court decision in the Republican Party of Minnesota v. White has established that those First Amendment rights are applicable to candidates. And I think it's fair to say that in order to be a candidate, you have to qualify to meet certain requirements. Well, to be a candidate, you have to qualify to meet certain requirements, and you have to do so for the United States Senate or whatever. Well, to vote as well. Don't you have to be a University of Montana student in good standing to be involved in the process? To be a candidate. But anyone can campaign. In fact, outside groups, people from New York City can. No. I asked who could vote. Votes are limited to students just like they're limited to citizens in the Federal system. And there are qualifications for office, just like you have to be a citizen and 35 years old to run for President of the United States. There are qualifications for being a candidate. Would you make the same argument if this were a first-grade election of the president of a first-grade class at a public school? Well, it clearly depends upon two factors. One is the entity established by the government exercising governmental power, which clearly the student government in University of Montana is exercising governmental power. And secondly, what kind of forum has been created? Well, you're telling me the criteria, but you're not wanting to answer my question. I don't know the facts. You'd have to give me more detail. Well, I guess my question is really aimed at finding out what role the educational mission plays. Because in my first-grade president example, a lot of what is happening is the pedagogical desire to teach children how government works. And it would seem to me, based on what we've seen in the record here, that the goals here, that a lot of what it is doing is educational, which is completely different from a city council election or a congressional election. Any educational benefit is incidental if we happen to want to learn from it. But here, that is, it seems to me, essential to the mission. And if that is true, how does that change the analysis? Well, it is actually incidental. I do not agree that it is central. In other words, this is not If it is, does it change the analysis? If it is central, no. Because this is So the first grader can have their rich parents spend $100,000 to get them elected as class president. Hazleton imposes certain legal requirements with respect to conducting such activities in secondary and elementary schools. With respect to universities, number one, in this circuit, it has not yet been established that Hazleton applies. Secondly, as you pointed out in Brown v. Charles Lee, even if Hazleton did apply, there's a distinction between the curriculum and extracurricular activities. This is, and the university admits on page 10 of its brief, this is extracurricular. And when you're talking about extracurricular activity, your opinion of My opinion only got one vote, though. I know. The result, but not a vote. With respect to Reinhart, he would say Hazleton does not apply to university settings at all. You made the distinction, which I think is an apt one, between extracurricular and curricular activities. And you would argue that the deference, Hazleton deference, applies to curriculum. Well, this is clearly not curriculum. Does that mean that no deference applies to extracurricular, even under that construct? Yes, it does not apply to extracurricular. No deference at all? No deference. That's right. I mean, that's the way I read your opinion in Brown. Now, furthermore, there's a distinction between government speech and Rosenberger from Southworth and Hazleton, because in those circumstances, the Court found that the speech was actually government speech because it was, A, funded by government, and, B, government controlled the content of the speech. There is no such thing here. This is purely private speech conducted in a public forum. Why is it a public forum? It's a public forum because of the university. Well, the Supreme Court did that. Well, it's not open to everybody. It is open to everybody. Let me ask you this. What's the forum? The forum is the election. All right. Now, can anybody just sign up to participate in that? No, the speech. We're talking about the campaign speech in an election. Well, why is it a public forum? I don't understand why it's a public forum. Because that's what the government has established. The campaign speech with respect to student elections is open to everyone. In fact, everyone participates. So we have evidence. It's not open. The election is not open to somebody who's not a student, who is not a member of the student body. The campaign is. Voting is not. But the campaign is. And this is a campaign limitation that we are challenging. On the student. We are not challenging that only students can vote. What you're challenging is that the limitation on the student, the amount of expenditures he or she can spend in pursuit of their particular office. That's right. Within a public forum, which the government has established, which is anyone can come in and campaign for and against candidates in this election. The only ones that are prohibited are candidates who spend more than $100. Of course, in a public forum that the government has established, content-based discrimination requires strict scrutiny. So you would equate this to, like, a public park or a public street where anybody can just stand up and say whatever they want at any time. Yes, exactly. What limitations are there on anyone in this form to campaign? It's a expenditure limitation. That's right. A content-based limit. Why is it content-based? Because it's candidate speech. Not every limitation is content-based. Content-based would be something that says you may speak about only university issues. You may not discuss any broader social issues like Iraq. That would be content-based. You cannot spend more than $100 on campaigning. Campaigning is the content. Campaigning is defined as appearances, publishing, advertisements, or distributing literature. So that's what you are limited to spend $100 on. Why is that, if anything, just a limitation on his status as a candidate? On his status as a candidate? Yes, on his status as a candidate. It's not a restriction on whether or not you can qualify for a candidate. You have to have signatures of 50 people. You have to be a student with a certain number of hours. Well, once you qualify as a candidate, why is it just not a limitation? Because it's not speech. What's the viewpoint that that limitation is trying to suppress? It's not viewpoint. It's content. You cannot spend more than $100 on campaigning. Okay? But you can talk for free as long as you want. You can do what? You can talk 24 hours a day from start to finish. Actually, no, you can't go into dorms and talk to people. There are other limits, the time, place, and manner type limits that are not being challenged here. But after all, there are more than 10,000 students here. And the whole idea is the students are given the choice to elect people who are going to exercise governmental power over them. That is, distribute money to their organizations or not, appoint people to university committees that will decide all sorts of questions that govern students. So, you know, the Supreme Court has dealt with so many of these arguments in Randall versus Sorrell and Buckley versus Vallejo. You know, this is campaign speech. And the only one that is limited is a candidate to spend more than $100. Everyone else can participate. That's what the form that the university has created, participation of anyone. And, in fact, they do. And the record is an advertisement that was run independently, posted around campus by apparently groups. And whether or not they were actually student groups or not is not known. And the university has no limits on students. Now, I think this case is different than the Alabama Student Party case. The Alabama Student Party case, 11th Circuit, was establishing time, place, and manner restrictions on the conduct of campaigns to minimize the disruptive effect of candidate electioneering. It was not imposing any content-based limits on what students can say. And as I mentioned, there are time, place, and manner limits in Montana. Those are not challenged in this case. Only those that affect what a candidate may say in running for office. I'd like to reserve the balance of my time. Thank you. We certainly may do that. You have more than three and a half minutes left. We'll hear from Mr. Aronofsky. Good morning, Your Honors. I'm David Aronofsky. I'm the General Counsel of the University of Montana. I'm here representing both George Dennison, the President of the University of Montana, and also the individually named, now former, student government officials who are listed as co-defendants in the complaint. Before getting into argument, I would like to address three points that Appellant's counsel raised during his oral argument. First, the university strongly disagrees that student elections are anything but an educational activity. I would refer the Court to page 70 of the Appellee's Excerpts of Record, which contains the relevant portion of the current ASUM Constitution. And it says in Article I, I'm sorry, Article II, Section 1, the ASUM shall be the representative body of the members of the association organized, and now I quote for emphasis, exclusively for educational and nonprofit purposes. Educate me about the University of Montana's student government. Does the student government determine which groups in Montana can get student funds for their clubhouses and their printing and their other activities? Yes, Your Honor. And can't those same persons who determine where the funds go pick the ideological color of the groups that they subsidize? Your Honor, consistent with the U.S. Supreme Court opinion in the year 2000, the Southworth v. University of Wisconsin Board of Regents, I think it's safe to say that the U.S. Supreme Court has determined the answer to your question must be no to the extent that student fund allocations can be somehow distributed by student governments at public universities on the basis of political viewpoint. The law is now very clearly established that there must be viewpoint neutrality in how funds are allocated. But that gets me into the Southworth case as a general legal principle, Your Honor, because there the court ruled that despite any other First Amendment infringements that might otherwise exist in the way that public university student governments function, when all is said and done, they function in an educational arena, as an educational program, and as long as there's a viewpoint neutral approach to allocating these funds, then the other more typical First Amendment types of considerations that you might well see applied to a non-educational, non-student government setting, including those mentioned by appellant counsel, would likely apply. So Southworth has given us very, very good law here. I would also refer this Court to an opinion issued by the Ninth Circuit a year before the Southworth opinion came up, and that was one written by Judge Thomas in Rounds v. the Oregon Public Interest Research Group, which was not a student government case per se. It did involve student fees going to the Public Interest Research Group in Oregon. And Judge Thomas does a very good job, perhaps in anticipation of what the Southworth case, which was being litigated in the Seventh Circuit at about the same time, was going towards. When he points out you simply must treat educational settings differently in your First Amendment analysis involving student governments and student organizations than you treat more traditional types of political speech. Picking up on that point, is it your – is it the university's contention that Hazelwood should apply here, you know, categorically? Your Honor, I didn't hear all of your questions. Well, is it the university's contention or position that Hazelwood should apply here categorically? Categorically, Your Honor, not sure. The Seventh Circuit, for the very first time in a published Federal district court opinion, in the en banc version of Hazelwood, did determine that Hazelwood, in fact, and the Hazelwood line of cases do apply in a post-secondary education setting. That, of course, is not binding on this circuit, but frankly, we can go either way on that. What's the university's position, or would the university draw a distinction as Judge Graber did in the case that she authored? Sure. And Brown v. Lee. Right. And I would add that as a professor of higher education law, I've been teaching Brown v. Lee since the opinion was issued. And I always make certain that my students understand, A, that Federal appellate judges do disagree among themselves legitimately. Well, I'm searching for the right answers. But your question is a good one, Your Honor. I think the University of Montana is very, very comfortable applying the Hazelwood line of reasoning in a post-secondary education setting. There are all manners of extracurricular activities that are part of an integral learning experience for students at the University of Montana. And let's not forget that student government at a public university, at least at ours, exists for leadership training in society. We think that's the case. But, you know, let me ask you this. You know, the underlying concerns in Hazelwood about the public, you know, secondary education and elementary education, you know, the need to protect the younger children and whatnot, that same concern, at least from my perspective, doesn't seem to carry over as nicely in the higher educational setting because, you know, you could have tender children at the age of 18 all the way to, you know, it would be ideal if I could go back to college and start all over again. It would be wonderful. Certainly, Your Honor. And we would agree there must be a practical, if nothing else, distinction between elementary children on the one hand and university students on the other hand with high school students, which is, by the way, where the Hazelwood case itself was about somewhere in the middle. But I think the issue of institutionally sponsored speech is really the question of whether the Hazelwood line of reasoning would apply. And, again, when all is said and done, student government at the University of Montana is not this independent, autonomous, then-for-itself organization that might lend itself to separation from the Hazelwood line of cases. Well, it would if you looked at it. Why wouldn't it if you looked at it on more of a traditional form-based analysis? Well, we would. The counsel argued that it was a public forum. I find that hard to agree with. We understand that. If you were to look at it as a limited public forum, you would apply, still apply a reasonable analysis. And then, of course, we would get into whether or not these particular restrictions are reasonable under the circumstances. Correct. And we would point the Court to the excerpts of record involving the reasons that these particular regulations have been adopted, how they work. And we think that they serve a very valid educational purpose. I guess we would take strong exception to the notion that, A, a student government is somehow a public forum, and, B, both the explicit point made by appellate counsel and also the implicit reasoning in that point, that somehow political speech, campaign speech, cannot be regulated by the government in a governmental setting. If you take a look at the Forbes versus Arkansas educational television case by the U.S. Supreme Court, 1998, you see here a classic case of government, not regulation, exclusion of campaign speech in a public university, public television station involving congressional campaign candidates. If the government can exclude, certainly it can regulate. Again, always subject to this viewpoint neutrality, I think, line. The one thing we know from Buckley is that Mr. Buckley was allowed to spend as much of his money as he wanted. Mr. Flint is not. I mean, he's really spending $240 instead of $100. This is not Mr. Gottrock's buying the election. This is true, Your Honor. And, again, the principle here probably should have nothing to do with the precise limits and more to do with the issue of whether it is lawful and appropriate to permit the student government, under the umbrella of the university's regulatory oversight, to do it. What is the pedagogical reason for limiting the expenditure of funds? Let me see if I get that. Your Honor, the reason would be to enhance the ability of people without money to run for and ostensibly win and hold student office. But that was completely rejected in Buckley v. Vallejo. Mr. Buckley is a very wealthy man, and the Supreme Court didn't say, we want to have unwealthy people also run against Mr. Buckley, so, therefore, it's okay to limit the kind of money that Buckley can spend. Forced egalitarianism is the antithesis of free speech. Do you not agree? I would accept the general principle that self-regulation of spending by individual candidates is not permissible under the First Amendment when public office is at stake, Your Honor. But we just simply have to insist on the difference between an educational setting. What is the educational, again, what is the pedagogical or educational purpose of limiting Mr. Flint from spending $240? It's twofold, Your Honor. First, inclusion, which we believe is a — is not only a legitimate, but a compelling public university interest to encourage, or at least to permit the conditions to be created to encourage the broadest possible inclusion of students to be able to run for office. And that does distinguish this from the other kinds of public offices. Is there any evidence in the record that the other candidates who intended to run for office couldn't afford $248? Not on that specific issue, Your Honor. No. But there is evidence in the record to show why these limits, such as they are, serve an invaluable and, we would submit, a compelling educational purpose. Also, there's simply, as long as we're on the compelling State interest, there's Again, leaving aside whether specific amounts might or might not seem at first or second or even third glance to be appropriate. And I would submit that that's something that the university, rather than the courts, should be the decision-maker on. But how else do we keep only wealthy people from participating in student government? If, in fact, the students with money decide they want to run for student office, very soon we're going to see a student government that looks much, much different from the student government. That's exactly the argument that was used against Mr. Buckley and which lost. But the difference, Your Honor, would be the educational setting. What is the educational setting? How does this make people better students? That's what you're really interested in. Your Honor. I understand your egalitarianism, and it must be very heartfelt. But that's not my question. My question is, how does this help these people be better students? By, well, we would submit that participation in student government almost certainly creates a leadership ethic that we want to see in society, which is an important part of it. So you're telling me that it's a good educational purpose because it gets people to campaign on a face-to-face, one-on-one, shoe-leather basis rather than buying ads and television using daddy's money? That is one advantage, Your Honor. And, of course, there's the self-government decision-making powers and process that our student government elected officials engage in after they're successfully elected to office. And that, of course, is part and parcel of why a public university has and should have student governments, is to teach students responsible leadership and behavior. I'm not going to sit here or stand here, rather, and argue that every student government decision is, by objective standards, 100 percent responsible, that we would all agree is responsible. But remember, students, if they're going to make mistakes, the time to make mistakes, assuming that they're minor and don't harm anybody, is when they're students. And this is part of the learning process that we all attempt to foster in a public university setting through programs such as student government. Let me ask you this. Since you've been teaching Brown versus Lee in your educational classes, what is your assessment of the dichotomy that was drawn in Brown? That is, applying Hazelwood more to the curricular activities as opposed to extracurricular activity, which apparently this election campaigning is. I'm a sitting member of that decision who wrote the opinion. Feel free to criticize. We get subject to criticism a lot. We're used to it. I'm glad to address it because it's something that we talk about. The issue before the court in Brown was clearly whether the student who wrote the graduate thesis had a right to put into the thesis, contrary to the issue of extracurricular activity was simply not in front of the court at that particular time. Certainly the Hazelwood line of reasoning was before the court, and we had the Holstein versus Carter case, which had been in the Seventh Circuit in a — well, I guess it was working its way up to the Seventh Circuit, now that I think about the date. But in any event, I would have to say that the issue of extracurricular activity was simply not before the court in that case. I see that my time has expired. Thank you. Thank you. That's okay. Thank you. We'll get to that. You have some rebuttal time remaining. Thank you. Of course, the university has a legitimate interest in teaching parliamentary procedure. They could have model United Nations. They could have all sorts of educational programs supervised by the faculty, content determined by the faculty, giving grades for people's participation. And that's the curriculum. This is set up to exercise governmental power, to do specific governmental things, distribute money. And, of course, under Southworth, as opposed to the way it was described, that money can be distributed contrary to the viewpoints of certain students as to whether or not those particular messages ought to be funded. And, of course, here we have an election for the students to decide what is going to be funded or not. So the proponent says that under Supreme Court ruling in 2000, that can't be done. It's got to be viewpoint neutral. Don't you accept that? It has to be viewpoint neutral, not content neutral. Under Southworth, the university won. The distribution of student fees by the University of Wisconsin was being done on a viewpoint neutral basis. But it was being done on a content un-neutral basis, and some people objected. They didn't want AIDS education or they didn't want religious student groups to be funded. So there was content, without doubt, and the court said, look, in the decision to distribute these funds, we have government speech because they are funding it and controlling the content. And students may object, but so be it. The university can still do it. Well, these are the decisions that individual students at University of Montana may disagree with. And so they want to support candidates that agree with their point of view on how the funds ought to be spent. Does the Board of Regents ultimately control whatever decisions the student body makes? Well, yes, ultimately. Ultimately? Ultimately. Through their regulations and through their policies and through what they delegate. So if the governing body of the student association were to take a position that subsequently the regents of the university disagreed with, could they override it? If it were a profound issue, you know, it would get their attention. Not under current policies of the Board of Regents because they have delegated that authority to the students. But do they ultimately have the authority? They would have the authority, yes, to require all those decisions to be made to go up the chain to the regents. I mean, they could do that. Now, secondly, this is really irrational. I mean, what is the educational purpose of teaching people how to run campaigns under a $100 spending limit? In the United States, spending limits by candidates are unconstitutional. So what are you teaching the students of use? How about the students that are of average means? Well, they can't raise more than $100. And what do people do in the United States when they run for office and they are of average means? They raise funds. So in the University of Montana, we have these. Why can't the university choose, as in Judge Baez's example, choose to prefer that students learn how to convince their peers one-on-one by talking to them rather than learning how to raise money? Those are both kinds of learning. I don't disagree with that. But why isn't the university free to pick one of those as the preferred thing it wants to teach, teach them how to discuss issues, how to discuss themselves and say I'm more worthy than this other candidate? There's no restrictions on one-on-one persuasion. The restriction — That's the point of Judge Baez's question. Why isn't that a valid educational goal, just as valid as teaching somebody how to raise money? Well, how is prohibiting raising money and spending money, which, of course, is what campaigns do in America, if you're educating them to run campaigns? That's what they do. I guess that's my question, which I'm not hearing an answer to. But I get to ask the questions. And my question is why can't the university choose not to train fundraisers but instead to train people who can engage in an individualized debate about their qualifications? Because prohibiting people from fundraising and spending money on advertising, it has nothing to do with training people how to go door-to-door. You can do both. They can put on programs and educational seminars on how to go door-to-door. But it's an incentive. Isn't it an incentive if they say you can't buy TV ads because you're only going to spend $100? You've got to convince people to vote for you. You've got to get out in the public forum. You've got to use your shoe leather. You've got to meet people. You've got to convince them. Look, in American elections, all these things are done. There is no relationship between prohibiting people from advertising and going door-to-door. People spend millions of dollars for office in America, and they go door-to-door at the same time because they have the time available to do it. And actually, to the extent that requiring people to go door-to-door, which is prohibited if you want to do it in the dorm, so they don't even advance that interest by their regulations because it's prohibited to do that, then that runs right up against the problem of distraction of campaigns from the actual educational mission of the university. Thank you, Counsel. You have exceeded your time, but we've led you down that path with our questions. We appreciate very much the arguments of both parties. Clint v. Denison is submitted. And our final case of the morning on the oral argument calendar is Lands Council v. Kevin Martin. And may I ask, Ms. Bredner, what the division of time is? Are all three parties going to be arguing orally? Yes, Your Honor. Okay. If I could get our deputy clerk to do ten minutes and five minutes, and then we'll count it down from 15, I think it will help everyone keep track of their time. But our first person gets 15, so we'll start there. All right. Thank you. Whenever you're ready to begin.
judges: Graber, Paez, Bea